# In the United States Court of Federal Claims

No. 14-735 C
Filed: November 18, 2014[1]

| | | |
|---|---|---|
| LYNXNET, LLC, | * | Bid Protest; |
| | * | Competition in Contracting Act of |
| Plaintiff, | * | 1984 ("CICA"), 31 U.S.C. § 3553 |
| | * | (Automatic Stay); |
| v. | * | Federal Acquisition Regulations |
| | * | ("FAR") 48 C.F.R. §§ 19.508(e) |
| THE UNITED STATES, | * | (Solicitation provisions and |
| | * | contract clauses), 52.219-14(c)(1) |
| Defendant. | * | (Limitations on subcontracting); |
| | * | 26 U.S.C. § 401K (Qualified pension, |
| and | * | profit-sharing, and stock bonus |
| | * | plans); |
| STRATEGIC OPERATIONAL | * | 15 U.S.C. §§ 644(o) (Awards or |
| SOLUTIONS, INC., | * | Contracts); |
| | * | 13 C.F.R. §125.1 (g) (Programs |
| Defendant-Intervenor. | * | included). |

**Dorn Charles McGrath, III**, Barnes & Thornberg, LLP, Washington, D.C., Counsel for the Plaintiff.

**Meen Geu Oh**, United States Department of Justice, Civil Division, Trial Attorney, Washington, D.C., Counsel for the Government.

**James Y. Boland**, Venable LLP, Baltimore, Maryland, Counsel for Defendant-Intervenor.

### MEMORANDUM OPINION AND FINAL ORDER

**BRADEN**, *Judge*.

---

[1] On October 23, 2014, the court forwarded a sealed copy of this Memorandum Opinion And Final Order to the parties to delete from the public version any confidential and/or privileged information, and note any citation or editorial errors requiring correction. The court has incorporated some of these comments and corrected or clarified certain portions herein.

I.      RELEVANT FACTUAL BACKGROUND.[2]

   A.      Solicitation No. DJF-14-1200-R-0000040.

On September 16, 2003, the President issued Homeland Security Presidential Directive – 6 ("HSPD – 6") to "protect the . . . United States against acts of terrorism" by "develop[ing], integrat[ing], and maintain[ing] . . . information about individuals known . . . or appropriately suspected" to be involved in terrorist activities. *See* Directive on Integration and Use of Screening Information To Protect Against Terrorism, HSPD-6 (Sept. 16, 2003), *available at* http://www.gpo.gov/fdsys/pkg/PPP-2003-book2/pdf/PPP-2003-book2-doc-pg1174.pdf (last visited Oct. 15, 2014). Directive HSPD-6 instructed federal departments and agencies to provide "all appropriate Terrorist Information" to the United States Attorney General to "establish an organization to consolidate the Government's approach to terrorism screening and provide for the appropriate and lawful use of Terrorist Information in screening processes." *Id*. The Attorney General established a Terrorist Screening Center ("TSC"), a multi-agency operational center in Vienna, Virginia, to manage the nation's Terrorist Screening Database. AR Tab 1, at 1. The TSC operates 24 hours per day, 7 days per week, with analysts working in continuous shifts to support law enforcement officials. AR Tab 1, at 1.

On January 16, 2014, the United States Department of Justice, Federal Bureau of Investigation ("FBI") solicited Request for Proposals No. DJF-14-1200-0000040 (the "RFP") for approximately 116 Full-Time Equivalent ("FTE") service employees to support the TSC Operations Branch for a base period of one year with up to four additional one-year option periods. AR Tab 1, at 1–255. The RFP was set aside for small businesses, certified under the Small Business Administration's ("SBA") Section 8(a) Business Development Program.[3] AR Tab 1a, at 87. The RFP required potential offerors to submit proposals addressing five factors: (1) Executive Summary; (2) Technical Evaluation; (3) Cost/Price; (4) Past Performance; and (5) Security. AR Tab 1a, at 92–93. The RFP also informed potential offerrors that this procurement was a best-value award, emphasizing the importance of price/cost factors and ranking non-price criteria in descending order of importance, *i.e.*, Technical Factor (Management Approach, Technical, and Transition); Price (Completeness, Realism, Reasonableness); Past Performance (Pass/Fail); and Security (Pass/Fail). AR Tab 1a, at 112. The RFP required that "[a]t least 50 percent of the cost of contract performance incurred for personnel shall be expended for employees of the concern." Federal Acquisition Regulations ("FAR") 52.219-14(c)(1). In addition, "[t]he contracting officer shall insert the clause at 52.219-14, Limitations on Subcontracting, in solicitations and contracts for supplies, services, and construction, if any portion of the requirement is to be set aside for small business and the contract amount is

---

[2] The facts discussed herein were derived from the August 29, 2014 Administrative Record ("AR Tabs 1–56" that are comprised of pages 1–3585).

[3] To qualify for the SBA's Section 8(a) Business Development Program, which is designed to help disadvantaged businesses compete in the marketplace, a business must meet certain eligibility requirements. *See* 15 U.S.C. § 637(a); UNITED STATES SMALL BUSINESS ADMINISTRATION, http://www.sba.gov/category/navigation-structure/eligibility-requirements (last visited Oct. 15, 2014).

expected to exceed $150,000." FAR 19.508(e) ("LOS Requirement"). The size of the RFP was $14 million. AR Tab 1a, at 87. In addition, the RFP emphasized the importance of "critical manpower" specialized in "watch-listing and encounter experience" to support the TSC. AR Tab 1a, at 47. It also required offerors to submit letters to ascertain whether the prime contractor or subcontractor intended to hire any individual who was not currently an employee. AR Tab 1a, at 99.

      B.    **Strategic Operational Solutions, Inc.'s Proposal.**

On February 19, 2014, Strategic Operational Solutions, Inc. ("STOPSO") submitted a proposal that included: (1) an Executive Summary; (2) a Technical Volume; (3) a Cost Volume; (4) a Past Performance Volume; (5) a Security Volume; and (6) a Contract Documentation Volume. AR Tab 4a–f, at 1078–1528. STOPSO's proposed price was $ **REDACTED**. AR Tab 4c, at 1355.

In the Technical Volume, STOPSO stated that it intended to hire **REDACTED** as an Industrial Hygienist. Tab 4b, at AR 1179. In accordance with Section L.10.2.2.1 of the RFP, STOPSO listed **REDACTED** as an employee of the prime contractor in the following employment chart:

| Names of Personnel | REDACTED |
|---|---|
| TSC Incumbent | REDACTED |
| Key | |
| Onsite at Contract Start? | REDACTED |
| Unit/Task | REDACTED |
| Labor Cat. | REDACTED |
| Minimum Education for Labor Category | REDACTED |
| Education Level of Proposed Individual | REDACTED |
| Minimum Experience of Labor Category | REDACTED |
| Experience Level of Proposed Individual | REDACTED |
| Minimum Skills for Proposed Individual / Relevant Competency / Skill Level | REDACTED |
| Prime, Subcontractor / Contingent Hire | REDACTED |
| Signed LOI | REDACTED |

AR Tab 4b, at 1179; AR Tab 1a, at 98 (directing offerors to mark hires as "P" for prime employees, "S" for subcontractor employees, "C" for contingent hires, "P/C" for contingent hires by the prime contractor, or "S/C" for contingent hires by the subcontractor).

STOPSO also stated that it would "attempt to source the [Industrial Hygienist] position . . . as a 1099[4] if it enables [them] to provide this . . . position at a reasonable rate for the [G]overnment." AR Tab 13, at 2527.

---

      [4] A 1099 employee is an independent contractor or a subcontractor. *See* INTERNAL REVENUE SERVICE, INSTRUCTIONS FOR FORM 1099-MISC (2014), *available at* http://www.irs.gov/pub/irs-pdf/i1099msc.pdf (last visited October 15, 2014).

STOPSO's proposal included a February 5, 2014 letter on STOPSO's stationary, but signed by **REDACTED**, indicating that his employment was contingent on STOPSO's receipt of the contract. AR Tab 4b, at 1287. The letter, however, did not state whether STOPSO was hiring **REDACTED** as an employee or as an independent contractor. AR Tab 4b, at 1287.

On April 3, 2014, STOPSO submitted a final proposal revision that included a detailed labor rate "build-up" for its current employees, but not for subcontractors. AR Tab 13, at 2508–21 (applying fringe benefits, overhead, general and administrative, and **REDACTED** profit/fee as costs for STOPSO employees, but applying only a **REDACTED** subcontractor handling fee to subcontracted work). This revised proposal reflected a reduced price of $58,898,521 (AR Tab 13, at 2494), including the direct labor rate, overhead with fringe benefits of **REDACTED**, general and administrative rate of **REDACTED**, and profit/fee of **REDACTED** for all STOPSO employees.[5] AR Tab 13, at 2515–21. In contrast, STOPSO applied a **REDACTED** handling fee to all subcontractors, including the Industrial Hygienist position. AR Tab 13, at 2515–21.

STOPSO's proposal also identified three proposed subcontractors: (1) **REDACTED**, (2) **REDACTED**, and (3) **REDACTED**, but did not list **REDACTED**. AR Tab 4a, at 1083; AR Tab 4b, at 1110–11.

STOPSO represented that it "thoroughly underst[oo]d all requirements of the solicitation and its amendments" and intended to "unconditionally accept all terms and conditions with no exceptions." AR Tab 13, at 2496.

### C. Lynxnet LLC's Proposal.

On February 19, 2014, Lynxnet, LLC ("Lynxnet") submitted a proposal, and on April 3, 2014, submitted a final proposal revision. AR Tab 3a–f, at 277–1077; AR Tab 12 at 1637–2477. Plaintiff's proposal included: (1) an Executive Summary; (2) a Technical Volume; (3) a Cost Volume; (4) a Past Performance Volume; (5) a Security Volume; and (6) a Contract Documentation Volume. AR Tabs 3a–f, at 277–1077. Therein, Lynxnet also identified "two second-tier subcontractors (independent contractors) as company '1099.'" AR Tab 20, at 2885. Lynxnet initially quoted a proposal price of $ **REDACTED**, but that amount was reduced to $77,515,540 in the final proposal. AR Tab 3c, at 760; AR Tab 40, at 3169. Lynxnet's total prime contractor labor cost was approximately 52%.[6]

---

[5] By law, the fringe benefits included in the "build-up" labor rate were available only to employees, not to subcontractors or independent contractors. *See* 26 U.S.C. § 401(k) (limiting 401(k) plans to "employers" for the benefit of "employees"); *see also* IRS PUBLICATION 15 (Circular E), Employer's Tax Guide § 14 (2013) ("Only the employer pays FUTA tax" on wages of "employees"); IRS INSTRUCTIONS FOR FORM 940 (2013), EMPLOYER'S ANNUAL FEDERAL UNEMPLOYMENT (FUTA) TAX RETURN (2013), at 2 ("You owe FUTA tax on the first $7,000 of wages you paid to each employee during a calendar year.") (emphasis added).

[6] AR Tab 20, at 2885 (observing that Lynxnet's "subcontractors account for 48% of Lynxnet's total price[]").

### D. The Award.

On April 24, 2014, the FBI issued a Source Selection Decision indicating that STOPSO and Lynxnet received the highest Technical rating, "Exceptional." AR Tab 30, at 2940.[7] The Source Selection Decision noted that, although "**REDACTED**" STOPSO's total proposal price was $59,398,178,[8] or approximately 25%, less than Lynxnet's proposed price. AR Tab 30, at 2936, 2940. Consequently, the FBI determined that STOPSO's proposal "provide[d] the best overall value to the Government" and awarded the contract to STOPSO. AR Tab 30, at 2940.

On April 24, 2014, the FBI sent an "Unsuccessful Notification" to Lynxnet. AR Tab 39, at 3166. On April 29, 2014, Lynxnet received a debriefing, during which the FBI explained that both STOPSO and Lynxnet received "**REDACTED**" on the Past Performance and Security factors. AR Tab 40, at 3168. In addition, both companies received a rating of "Exceptional" for three non-price subfactors constituting the offerors' overall Technical ratings. AR Tab 40, at 3168–69. But, because STOPSO and Lynxnet received the same ratings on the other factors, "**REDACTED**." AR Tab 40, at 3169. As a result, the FBI awarded the contract to STOPSO, based on its substantially lower proposal price of $59,398,178. AR Tab 40, at 3169. Lynxnet's final price was $77,515,540. AR Tab 40, at 3169.

## II. RELEVANT PROCEDURAL HISTORY.

### A. The Governmental Accountability Office Protest.

On May 2, 2014, Lynxnet filed a protest with the Government Accountability Office ("GAO") contesting the FBI's evaluation of STOPSO's proposal as to: technical ratings; price realism; past performance; security requirements; disparate treatment; the source selection decision; and best value determination. AR Tabs 42 & 42a–b, at 3271–3403; AR Tab 45, at 3417–28. While the GAO protest was pending, contract performance was suspended, pursuant to the automatic stay provisions of the Competition in Contracting Act of 1984 ("CICA"), 31 U.S.C. § 3553 (2012). Pl. 8/29/14 Mem. at 8.

On May 29, 2014, Lynxnet also filed a supplemental protest. AR Tab 45, at 3417–3493. Specifically, Lynxnet contended that STOPSO's representation that "it will attempt to source [the Industrial Hygienist] position as a 1099[,] if it enables [STOPSO] to provide this highly

---

[7] The April 24, 2014 Source Selection Decision also refers to both STOPSO's and Lynxnet's Technical ratings as "Excellent," instead of "Exceptional." AR Tab 30, at 2930. It appears that these terms were either used interchangeably or this was a clerical error, as other documents in the Administrative Record refer to their Technical ratings as "Exceptional." *Compare* AR Tab 30, at 2930 *with* AR Tab 30, at 2940 & AR Tab 40, at 3169.

[8] An April 10, 2014 FBI Memorandum, prepared as a "cursory review to assist . . . in the evaluation of th[e] proposal," reported that STOPSO's original price was $60,282,068, and the final revised price was $59,398,521. AR Tab 21, at 2888–91. The difference between the prices quoted in STOPSO's proposals, the FBI Memorandum, and the Source Selection Decision appear to be attributable to differences in accounting resolved through further discussions. AR Tab 21, at 2888–91.

5

qualified position at a reasonable rate to the [G]overnment" should have led the FBI to question whether STOPSO could comply with FAR 52.219–14(c)(1), *i.e.*, the LOS Requirement.[9] AR Tab 45, at 3522–23. Lynxnet also contended that STOPSO's proposed addition of an Industrial Hygienist as a 1099 independent contractor improperly increased STOPSO's labor costs from 49.5% to above the 50% LOS requirement threshold. AR Tab 53, at 3573. Lynxnet acknowledged that it was an "open question" whether STOPSO's proposal complied with the LOS Requirement. AR Tab 45, at 3422. In any event, Lynxnet challenged STOPSO's indication that it would incur 50.1% of the total labor cost under its proposal terms. AR Tab 45, at 3423 n.1. The FBI also "failed to confirm [whether] STOPSO's 'profit/fee' is a labor cost or cost of contract performance incurred for personnel[.]" AR Tab 45, at 3423 n.1.

On August 4, 2014, the GAO denied Lynxnet's initial protest on the merits and rejected the LOS Requirement issue as not timely filed. AR Tab 53, at 3574.

### B.     The SBA Protest.

On April 30, 2014, Lynxnet also filed a size protest to the United States Small Business Administration ("SBA"). AR Tabs 41 & 41a, at 3188–3270. On August 18, 2014, the SBA concluded that "STOPSO will perform more than 50 percent of the contract labor with its own employees," as "reflected in its contract proposal and in its response to the protest." AR Tab 56, at 3584. On August 29, 2014, Lynxnet filed an appeal of that decision with the SBA Office of Hearings and Appeals ("OHA") that is currently pending. Pl. 8/29/14 Mem. at 10.

### C.     United States Court of Federal Claims.

On August 13, 2014, Lynxnet filed a Complaint in the United States Court of Federal Claims under seal, challenging the contract award to STOPSO. Lynxnet also filed a Motion For Temporary Restraining Order, a Motion For Preliminary Injunction, a Motion To Seal Document, and a Motion For Protective Order. On that same day, STOPSO filed an unopposed Motion To Intervene. On August 14, 2014, the court held a status conference and granted the Motion To Seal, the Motion For Protective Order, and the Motion To Intervene.

On August 19, 2014, the court held a second status conference and entered a Scheduling Order the next day. On August 22, 2014, the Government filed the Administrative Record under seal. On August 29, 2014, Plaintiff filed a Motion For Judgment On The Administrative Record ("Pl. 8/29/14 Mot.") and Memorandum In Support ("Pl. 8/29/14 Mem."), under seal.

On September 5, 2014, the Government and Intervenor each filed separate Cross-Motions And Responses ("Gov't 9/5/14 Mem." and "Int. 9/5/14 Mem."). On September 10, 2014, Plaintiff filed a Memorandum In Opposition And Reply ("Pl. 9/10/14 Opp. & Reply"). On September 15, 2014, the Government and Intervenor each filed a separate reply ("Gov't 9/15/14 Reply" and "Int. 9/15/14 Reply"). On September 24, 2014, the court entered an Order extending

---

[9] The LOS Requirement sets aside certain government contracts for small business requiring that "[a]t least 50 percent of the cost of contract performance incurred for personnel shall be expended for employees of the concern." FAR 52.219-14(c)(1).

6

the voluntary stay referenced in the August 19, 2014 Scheduling Order for an additional 60 days to November 24, 2014.

### III. DISCUSSION.

#### A. Jurisdiction.

The United States Court of Federal Claims is required to make a threshold determination regarding jurisdiction. *See Fisher v. United States*, 402 F.3d 1167, 1173 (Fed. Cir. 2005) ("[A]t the outset [the court] shall determine . . . whether the Constitutional provision, statute, or regulation is one that is money-mandating. If the court's conclusion is that the Constitutional provision, statute, or regulation meets the money-mandating test, the court shall declare it has jurisdiction over the cause, and shall then proceed with the case in the normal course.").

Pursuant to 28 U.S.C. § 1491(b)(1), the United States Court of Federal Claims has jurisdiction:

> to render judgment on an action by an interested party objecting to a solicitation by a Federal agency for bids or proposals for a proposed contract or to a proposed award or the award of a contract or any alleged violation of statute or regulation in connection with a procurement or a proposed procurement.

*Id.*

The August 13, 2014 Complaint alleged several violations of law and/or regulation "in connection with" this procurement. *Id.* Count I alleges that STOPSO failed to comply with FAR 52.219-14(c)(1), the LOS Requirement incorporated into the RFP, requiring that "[a]t least 50 percent of the cost of contract performance incurred for personnel shall be expended for employees of the concern." Compl. ¶¶ 32–44. Count I also alleges that the position of Industrial Hygienist improperly was included in STOPSO's labor costs, since **REDACTED** was a subcontractor, so that STOPSO's actual labor costs were only 49.93%. Compl. ¶ 39. Therefore, the FBI's review of STOPSO's proposal was "arbitrary and capricious, contrary to law, and unreasonable." Compl. ¶ 41. In addition, Count I alleges that the FBI made three mistakes in its review of STOPSO's proposal: (1) it failed to act on an improper calculation in STOPSO's proposal; (2) it failed to act on STOPSO's use of a 1099 employee for the Industrial Hygienist position; and (3) it failed to conduct discussions with STOPSO about their proposal's failure to comply with the LOS Requirement. Compl. ¶¶ 37–43.

Count II alleges that "to the extent STOPSO's proposal was conditional, it should be deemed unacceptable for failure to unambiguously demonstrate acceptance [of the LOS Requirement]." Compl. ¶ 47. If STOPSO's proposal of the Industrial Hygienist as an independent contractor was conditional, thereby reducing the overall proposal price, then "the assertion [was] merely a promise that STOPSO could meet the [LOS Requirement] sometime post award," invalidating STOPSO's proposal. Compl. ¶ 48. Therefore, the FBI should have discussed this issue with STOPSO or deemed STOPSO's proposal noncompliant. Compl. ¶¶ 49–50.

Accordingly, the August 13, 2014 Complaint alleges sufficient facts of a money-mandating claim to satisfy 28 U.S.C. § 1491(b)(1), as it places at issue violations of law and/or regulation "in connection with" this procurement.

### B.     Standing.

As a threshold matter, a plaintiff contesting the award of a federal contract must establish that it is an "interested party" to have standing under 28 U.S.C. § 1491(b)(1).  *See Myers Investigative & Sec. Servs. v. United States*, 275 F.3d 1366, 1370 (Fed. Cir. 2002) ("[S]tanding is a threshold jurisdictional issue.").  The United States Court of Appeals for the Federal Circuit has construed the term "interested party" under 28 U.S.C. § 1491(b)(1) as synonymous with "interested party" under CICA, 31 U.S.C. § 3551(2)(A) (2006).  *See Rex Serv. Corp. v. United States*, 448 F.3d 1305, 1307 (Fed. Cir. 2006) (citing decisions adopting the CICA definition of "interested party" for 28 U.S.C. § 1491(b)(1) purposes).  A two-part test is applied to determine whether a protestor is an "interested party:" the protestor must show that "(1) it was an actual or prospective bidder or offeror, and (2) it had a direct economic interest in the procurement or proposed procurement." *Distrib. Solutions, Inc. v. United States*, 539 F.3d 1340, 1344 (Fed. Cir. 2008) (citations omitted).  In addition, to establish "interested party" status, a protestor must show the alleged errors in the procurement were prejudicial.  *See Labatt Food Serv., Inc. v. United States* ("*Labatt*"), 577 F.3d 1375, 1378–79 (Fed. Cir. 2009) ("It is basic that because the question of prejudice goes directly to the question of standing, the prejudice issue must be reached before addressing the merits.") (internal citations and quotations omitted); *see also Myers Investigative and Sec. Serv., Inc. v. United States*, 275 F.3d 1366, 1370 (Fed. Cir. 2002) ("[P]rejudice (or injury) is a necessary element of standing.").  A party demonstrates prejudice when "it can show that but for the error, it would have had a substantial chance of securing the contract." *Labatt*, 577 F.3d at 1378.  Importantly, a proper standing inquiry must not conflate the requirement of "direct economic interest" with prejudicial error.  *Id.* at 1380 (examining economic interest but excluding prejudicial error from the standing inquiry "would create a rule that, to an unsuccessful but economically interested offeror in a bid protest, any error is harmful[]").

In this case, Lynxnet submitted a proposal in response to the RFP.  AR Tab 3a–f, at 277–1077.  As an interested bidder, Lynxnet satisfies the first element of the "interested party" test.  *See Distrib. Solutions, Inc.*, 539 F.3d at 1344.

As to the second element, *i.e.*, that plaintiff "must show that it had a 'substantial chance' of winning the contract," Lynxnet has satisfied that element, because the FBI considered Lynxnet's bid competitive and awarded it a Technical rating of "Exceptional."  AR Tab 30, at 2940; AR Tab 40, at 3169.  Only Lynxnet and STOPSO received this rating.  AR Tab 30, at 2940.  Since the FBI gave the offerors' Technical ratings the most weight of the non-price factors, there was a "substantial chance" that the FBI would have awarded the contract to Lynxnet.  In fact, the FBI's April 25, 2014 Final Award Recommendation Report "**REDACTED**."  AR Tab 29, at 2528.  Therefore, as a matter of law, Lynxnet also meets the second element of the "interested party" test by showing "direct economic harm."

As to prejudice, Lynxnet contends that the FBI failed to exclude STOPSO's proposal, despite the fact that it was not in compliance with the LOS Requirement.  Pl. 8/29/14 Mot. at 1

8

("STOPSO's proposal, on its face, did not agree to comply with the Solicitation's Limitations on Subcontracting ('LOS') requirement [in FAR 52.219-14(c)(1)]."). The FBI's failure to exclude a proposal that did not comply with the requirements of the RFP would constitute an error. In turn, this error would prejudice Lynxnet, because "there is a 'substantial chance' [that Plaintiff] would have received the contract award but for the . . . error[] in the bid process." *Bannum, Inc. v. United States*, 404 F.3d 1346, 1358 (Fed. Cir. 2005); *see also Labatt*, 577 F.3d at 1380.

For these reasons, the court has determined that Lynxnet has standing to seek an adjudication of this bid protest.

### C. Standard of Review.

Pursuant to the Tucker Act, as amended by the Administrative Dispute Resolution Act, Pub. L. No. 104-320 § 12, 110 Stat. 3870, 3874 (Oct. 19, 1996), the United States Court of Federal Claims is authorized to review challenges to agency decisions, pursuant to the standards set forth in the Administrative Procedure Act ("APA"), 5 U.S.C. § 706. *See* 28 U.S.C. § 1491(b)(4) ("In any action under this subsection, the courts shall review the agency's decision pursuant to the standards set forth in section 706 of title 5."); *see also* 5 U.S.C. § 706(2)(A) ("The reviewing court shall . . . hold unlawful and set aside agency action, findings, and conclusions found to be . . . arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law[.]"); *Banknote Corp. of Am., Inc. v. United States*, 365 F.3d 1345, 1350 (Fed. Cir. 2004) ("Among the various APA standards of review in section 706, the proper standard to be applied in bid protest cases is provided by 5 U.S.C. § 706(2)(A): a reviewing court shall set aside the agency action if it is 'arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law.'") (citations omitted); *Weeks Marine, Inc. v. United States*, 575 F.3d 1352, 1358 (Fed. Cir. 2009) (same).

When a bid protest is based on a regulatory or procedural violation, *i.e.*, "not in accordance with law," our appellate court also has imposed an additional requirement that "the disappointed bidder must show a clear and prejudicial violation of applicable statutes or regulations." *Axiom Res. Mgmt., Inc. v. United States*, 564 F.3d 1374, 1381 (Fed. Cir. 2009) (internal quotations and citations omitted). This burden is even greater when the procurement is a "best value" procurement, as is the case here. *See Galen Med. Assocs., Inc. v. United States*, 369 F.3d 1324, 1330 (Fed. Cir. 2004) ("[A]s the contract was to be awarded based on 'best value,' the contracting officer had even greater discretion . . . . [T]he relative merit of competing proposals is primarily a matter of administrative discretion.") (citations omitted); *see also TRW, Inc. v. Unisys Corp.*, 98 F.3d 1325, 1327 (Fed. Cir. 1996) ("In determining whether the agency has complied with the regulation authorizing best value procurements, the [reviewing authority] may overturn an agency's decision if it is not grounded in reason.").

If an award decision is challenged, because it was made without a rational basis, the trial court must determine "whether the contracting agency provided a coherent and reasonable explanation of its exercise of discretion, and the disappointed bidder bears a heavy burden of showing that the award decision had no rational basis." *Impresa Construzioni Geom. Domenico Garufi v. United States*, 238 F.3d 1324, 1332–33 (Fed. Cir. 2001) (international citations and quotations omitted); *see also Savantage Fin. Servs., Inc. v. United States*, 595 F.3d 1282, 1287 (Fed. Cir. 2010) ("[W]e must sustain an agency action unless the action does not evince rational

reasoning and consideration of relevant factors.") (internal alterations, quotations, and citations omitted); *Weeks Marine*, 575 F.3d at 1368–69 ("We have stated that procurement decisions invoke highly deferential rational basis review . . . . Under that standard, we sustain an agency action evincing rational reasoning and consideration of relevant factors.") (internal alterations, quotations, and citations omitted).

In the alternative, if an award decision is challenged on the grounds that an agency acted in an arbitrary or capricious manner, the court may intervene "only in extremely limited circumstances." *United States v. John C. Grimberg Co., Inc.*, 702 F.2d 1362, 1372 (Fed. Cir. 1983). "Courts have found an agency's decision to be arbitrary and capricious when the agency 'entirely failed to consider an important aspect of the problem, offered an explanation for its decision that runs counter to the evidence before the agency, or [the decision] is so implausible that it could not be ascribed to a difference in view or the product of agency expertise.'" *Ala. Aircraft Indus., Inc.-Birmingham v. United States*, 586 F.3d 1372, 1375 (Fed. Cir. 2009) (quoting *Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983)); *see also John C. Grimberg Co., Inc.*, 702 F.2d at 1372 (holding that the court may set aside agency action "only in extremely limited circumstances").

In this case, the parties have filed Cross-Motions For Judgment On The Administrative Record, requiring the court to conduct a proceeding akin to an expedited trial on the record. *See* RCFC 52.1; *see also Bannum*, 404 F.3d at 1356 ("[T]he judgment on an administrative record is properly understood as intending to provide for an expedited trial on the record."). The existence of a material issue of fact, however, does not prohibit the court from granting a motion for judgment on the administrative record, although the court has not conducted an evidentiary proceeding. *Bannum*, 404 F.3d at 1357 (authorizing the court to make "factual findings under RCFC [52.1][10] from the [limited] record evidence as if it were conducting a trial on the record").

### D. Whether The Federal Bureau Of Investigation's Contract Award To Strategic Operational Solutions Violated FAR 52.219-14(c)(1).

#### 1. Plaintiff's Argument.

Lynxnet ("Plaintiff") argues that the FBI violated FAR 52.219-14(c)(1) (requiring that "[a]t least 50 percent of the cost of contract performance incurred for personnel shall be expended for employees of the concern[]"), because "STOPSO proposed an Industrial Hygienist in a '1099' position (*i.e.*, an independent contractor)," so that 50 percent of the personnel cost of contract performance was not for STOPSO employees. Pl. 8/29/14 Mem. at 2 (citing AR Tab 13, at 2527 (statement in STOPSO's proposal that reads: "STOPSO will attempt to source [the Industrial Hygienist] position as a 1099 if it enables us to provide this highly qualified position at a reasonable rate for the [G]overnment.")). Plaintiff also relies on **REDACTED** February 5, 2014 letter, indicating that his employment was contingent on STOPSO receiving the contract award.

---

[10] In 2006, RCFC 56.1 "Review of a Decision on the Basis of the Administrative Record" was repealed and replaced with RCFC 52.1, to conform to the United States Court of Appeals for the Federal Circuit's decision in *Bannum*, 404 F.3d at 1354 (holding that the court should "make factual findings from the record evidence as if it were conducting a trial on the record"). *See* RCFC 52.1, 2006 Rules Committee Notes.

Pl. 9/10/14 Opp. & Reply at 8–9 (citing AR Tab 4b, at 1287). In addition, "[t]he nature of an Industrial Hygienist's specialized skills, the STOPSO proposal, and the Solicitation SOW all confirm that STOPSO's proposed Industrial Hygienist is an independent contractor." Pl. 8/29/14 Mem. at 16. Therefore, STOPSO's actual employee cost, excluding the Industrial Hygienist, is 49.93%, or short of the 50% LOS Requirement. Pl. 8/29/14 Mem. at 18–19.[11]

Plaintiff insists that compliance with the LOS Requirement is a matter of proposal acceptability. Pl. 8/29/14 Mem. at 12–13; Pl. 9/10/14 Opp. & Reply at 4. Therefore, the FBI should have rejected STOPSO's proposal for noncompliance with a material solicitation requirement. Pl. 8/29/14 Mem. at 21–23. "[T]he issue is not whether STOPSO *could* comply with the requirements of the LOS clause, but rather whether STOPSO agreed it *would* comply with the requirements of the clause." Pl. 8/29/14 Mem. at 21 (emphasis in original). In the alternative, STOPSO's proposal is unacceptably ambiguous, and "the FBI's acceptance of STOPSO's offer despite its conditional nature . . . was an improper waiver . . . of the Solicitation's LOS [R]equirement." Pl. 8/29/14 Mem. at 22–23.

### 2. The Government's and Strategic Operational Solutions' Response.

The Government and STOPSO respond that Plaintiff misinterpreted the statement that "STOPSO will attempt to source this position as a 1099 if it enables [STOPSO] to provide this highly qualified position at a reasonable rate for the [G]overnment." AR Tab 13, at 2527. "STOPSO simply alerted the FBI to the fact that, during contract performance, STOPSO *might* classify **REDACTED** as an independent contractor as a potential way to save cost (*i.e.*, lower the proposed 'employee' rate of $ **REDACTED**/hour)." Int. 9/5/14 Mem. at 13; *see also* Int. 9/5/14 Mem. at 24–25 (stating that STOPSO was "committing to . . . full compliance with the LOS clause"); Gov't 9/15/14 Reply at 4 (referring to the conditional statement as "a performance-related aside").

The Government and STOPSO further contend that Plaintiff's characterization of **REDACTED** as a subcontractor "ignores the record." Gov't 9/5/14 Mem. at 1; Int. 9/5/14 Mem. at 4 (complaining that Plaintiff "cherry-picked a single phrase to characterize STOPSO's proposal as something other than what it was, while ignoring the rest of STOPSO's proposal"). STOPSO adds that this sentence was "unnecessary and had no material impact on the proposal." Int. 9/5/14 Mem. at 13; *see also* Gov't 9/15/14 Reply at 2–5 (explaining that the sentence does not eviscerate STOPSO's compliance with the LOS Requirement). In fact, the staffing matrix in STOPSO's Technical Volume properly informed the FBI that **REDACTED** would be a prime contractor hire. Gov't 9/5/14 Mem. at 11–12; Int. 9/5/14 Mem. at 7. By coding **REDACTED** position with a "P", STOPSO "unequivocally proposed the Industrial Hygienist as a prime

---

[11] Plaintiff also implies that STOPSO's failure to hire **REDACTED** as an employee evidences that he was an independent contractor. Pl. 9/10/14 Opp. & Reply 13–14. **REDACTED** hire, however, was delayed by the voluntary stay entered into by the parties. *See* Docket No. 18, at 2; Int. 9/15/14 Reply 7 n.2.

employee." Gov't 9/15/14 Reply at 4 (citing AR Tab 4b, at 1287); Int. Mot. at 7 (citing AR Tab 4c, at 1179).[12]

The Government and STOPSO also refute Plaintiff's characterization of **REDACTED** February 5, 2014 letter, arguing that the contingency "clearly related to a condition precedent required to occur before **REDACTED** would be employed—not whether he would be brought on as a subcontractor or prime employee." Gov't 9/15/14 Reply at 6; Int. 9/15/14 Reply at 6–7. STOPSO also notes that "all personnel on the contract, whether the employee currently worked for STOPSO or not" signed identical letters of intent. Int. 9/15/14 Reply at 6.

In addition, the Government and STOPSO cite other record evidence that confirms that **REDACTED** was a prime contractor employee. STOPSO's proposal provided the FBI with a labor rate build-up for each of its employees, but not for subcontractors. Int. 9/5/14 Mem. at 8–12. These build-ups included proposed overhead, including fringe benefits. Int. 9/5/14 Mem. at 11. STOPSO emphasized that fringe benefits applied only to employees. Int. 9/5/14 Mem. at 11–12. Specifically, the labor rate build-up included a **REDACTED** profit/fee for STOPSO employees. In contrast, STOPSO included a **REDACTED** handling fee for subcontractors. Int. 9/5/14 Mem. at 9–10. STOPSO created a labor rate build-up for the Industrial Hygienist position that included both fringe benefits and a **REDACTED** profit/fee. Int. 9/5/14 Mem. at 8–12. STOPSO did not include **REDACTED** or the Industrial Hygienist position when listing its proposed subcontractors. Gov't 9/15/14 Reply at 4 (citing AR Tab 13, at 2528–30); Int. 9/5/14 Mem. at 7–8. STOPSO listed only three "Proposed Probable Subcontractors"— **REDACTED**, **REDACTED**, and **REDACTED** —as "Team STOPSO." Gov't 9/5/14 Mem. at 13 (citing AR Tab 13, at 2528); Int. 9/5/14 Mem. at 7 (citing AR Tab 4b, at 1111). Finally, STOPSO unconditionally accepted all conditions of the contract, including compliance with the LOS Requirement. Gov't 9/5/14 Mem. at 13 (citing STOPSO's statement at AR Tab 13, at 2496 that it "thoroughly underst[oo]d all requirements of the solicitation and its amendments" and intended to "unconditionally accept all terms and conditions with no exceptions").

### 3. The Court's Resolution.

Plaintiff's noncompliance with the LOS Requirement argument is based on the following statement in STOPSO's nearly 500-page proposal: "STOPSO will *attempt* to source [the Industrial Hygienist] position as a 1099 *if* it enables [STOPSO] to provide this highly qualified position at a reasonable rate for the [G]overnment." AR Tab 13, at 2527 (emphasis added). STOPSO's staffing matrix, however, identified this individual as a STOPSO employee. AR Tab 4b, at 1179. This is not inconsistent with **REDACTED** February 5, 2014 letter that states: "The position is *contingent upon contract award and funding* for Solicitation #DJF-14-1200-0000040[.]" AR Tab 4b, at 1287. Nothing in this letter provides any indication that **REDACTED** was a subcontractor. In fact, the Administrative Record contains numerous letters of intent from Plaintiff indicating that other potential employee positions were conditional or contingent. *See generally* AR Tab 3b, at 408–523.

---

[12] Although **REDACTED** could possibly have been coded as "P/C" for contingent hire by the prime contractor, "[s]uch a designation still would have indicated **REDACTED** status as a STOPSO employee under the proposal, not a subcontractor." Int. 9/15/14 Reply at 7.

12

Plaintiff also suggests that the combination of **REDACTED** specialized skills, duties, advanced degrees, and high hourly wage establish that the Industrial Hygienist position was that of a subcontractor. Pl. 8/29/14 Mem. at 16–17. But, references to the Industrial Hygienist position elsewhere in STOPSO's proposal do not support that contention. Notably, STOPSO's labor rate build-up for the Industrial Hygienist position included fringe benefits and a **REDACTED** profit/fee attributed only to employees. AR Tab 13, at 2515.[13] In addition, STOPSO did not list **REDACTED** as a proposed subcontractor nor include the **REDACTED** subcontractor handling fee in the labor rate build-up for the Industrial Hygienist position. AR Tab 4a, at 1083; AR Tab 4b, at 1111; AR Tab 13, at 2516; AR Tab 13, at 2528.

For these reasons, the court has determined that the FBI's contract award to STOPSO did not violate FAR 52.219-14(c)(1).

### E. Whether The Federal Bureau Of Investigation's Review Of Strategic Operational Solutions' Proposal Otherwise Violated The Administrative Procedures Act.

#### 1. Plaintiff's Argument.

Plaintiff argues that the Government's review of STOPSO's proposal was arbitrary and capricious or an abuse of discretion, and contrary to procurement law for three reasons. First, the FBI "Fail[ed] to Act on STOPSO's Improper Proposal Calculation ('50.1%') of the Cost of Contract Performance When It Obviously Included 'Fee' and 'Pass Thru' Charges[.]" Pl. 8/29/14 Mem. at 13. Second, the FBI "Fail[ed] to Act on STOPSO's Use of a '1099[.]'" Pl. 8/29/14 Mem. at 14. Third, the FBI "Fail[ed] to Conduct Discussions With STOPSO Regarding Its Not Meeting the LOS Requirement[.]" Pl. 8/29/14 Mem. at 18.

First, the FBI "neglected to recognize, ignored, or improperly waived a glaring issue on the face of STOPSO's proposal," because it "included profit ('[a **REDACTED**] fee' and 'pass thru' charges)" (Pl. 8/29/14 Mem. at 13) in violation of 13 C.F.R. § 125.1(g) that defines: "Cost of contract performance incurred for personnel" as "direct labor costs and any overhead which has only direct labor as its base, plus the concern's General and Administrative rate multiplied by the labor cost." 13 C.F.R. § 125.1(g) (emphasis added).

---

[13] The Government also notes that "none of the other five competitive offerors proposed the Industrial Hygienist as a 1099." Gov't 9/15/14 Reply at 4 n.4.

This is evidenced by STOPSO's "Proposed Cost/Price/Fee: Total Price Summary" table that shows the **REDACTED** fee:

| Cost Element | Base Year | Option Year 1 | Option Year 2 | Option Year 3 | Option Year 4 | Total |
|---|---|---|---|---|---|---|
| REDACTED | REDACTED | REDACTED | REDACTED | REDACTED | REDACTED | REDACTED |
| REDACTED | REDACTED | REDACTED | REDACTED | REDACTED | REDACTED | REDACTED |
| | | | | | | |
| REDACTED | REDACTED | REDACTED | REDACTED | REDACTED | REDACTED | REDACTED |
| REDACTED | REDACTED | REDACTED | REDACTED | REDACTED | REDACTED | REDACTED |
| | | | | | | |
| REDACTED | REDACTED | REDACTED | REDACTED | REDACTED | REDACTED | REDACTED |
| REDACTED | REDACTED | REDACTED | REDACTED | REDACTED | REDACTED | REDACTED |
| | | | | | | |
| REDACTED | REDACTED | REDACTED | REDACTED | REDACTED | REDACTED | REDACTED |
| | | | | | | |
| REDACTED | REDACTED | REDACTED | REDACTED | REDACTED | REDACTED | REDACTED |

AR Tab 13, at 2494.

The FBI was aware of this regulatory requirement, because the contracting officer recalculated STOPSO's total contracting cost to exclude profit, resulting in a .45% increase from the calculation contained in STOPSO's table. Pl. 8/29/14 Mem. at 13–14.[14] This was "a tacit admission that the STOPSO proposal . . . was, on its face, incorrect[,]" and "[i]t was not within the contracting officer's purview to begin rewriting STOPSO's proposal in an attempt to render it acceptable." Pl. 8/29/14 Mem. at 14.

Second, "[t]he contracting officer compounded her mistake when she failed to take into account STOPSO's obvious use of a 1099 to perform work required by the contract." Pl. 8/29/14 Mem. at 14, 16; Pl. 9/10/14 Opp. & Reply at 7–9, 12–13 (noting the contracting officer's failure to explicitly state whether **REDACTED** was a STOPSO employee or subcontractor).

Third, the contracting officer also erred by not conducting discussions with STOPSO "despite the facial implausibility of STOPSO's compliance with the LOS clause[,]" and this error cannot be "'corrected' through clarification." Pl. 8/29/14 Mem. at 19. The FBI also viewed STOPSO's use of an Industrial Hygienist as a "strength," without recognizing that STOPSO proposed the position as a subcontractor. Pl. 8/29/14 Mem. at 20. Consequently, the FBI did not evenhandedly evaluate Plaintiff's and STOPSO's proposals. Pl. 8/29/14 Mem. at 20.

        2.        **The Government's And Strategic Operational Solutions' Response.**

STOPSO responds that there was no miscalculation in the "Proposed Cost/Price/Fee: Total Price Summary" table, because "[t]his table was not an attempt to depict STOPSO's compliance with the LOS clause . . . but simply a reflection of the total subcontractor cost to STOPSO (*i.e.*, showing subcontractor costs including profit/fee)." Int. 9/5/14 Mem. at 9. In

---

[14] The contracting officer made this calculation only after Plaintiff raised the issue of LOS compliance at the GAO. Pl. 9/10/14 Reply at 6.

addition, the SBA concluded that "STOPSO will perform more than 50% of the contract labor with its own employees." Int. 9/5/14 Mem. at 5 (citing AR Tab 56, at 3584). The SBA found that STOPSO complied with the LOS Requirement, because when recalculated, STOPSO's proposal indicates that it would incur 50.55% of the labor costs. Gov't 9/15/14 Reply at 3 n.2, 4 n.3. This amount complies with the LOS Requirement, as it is a .45% increase from STOPSO's purported miscalculation of labor costs. Gov't 9/15/14 Reply at 4 n.3; Int. 9/15/14 Mem. at 13–14 ("[Plaintiff] is literally arguing that the FBI committed a material mistake because STOPSO included a table allegedly showing it would perform 50.1% of the cost of labor on its own employees instead of 50.55%, when the requirement under the LOS clause is only 50%[.]") (emphasis omitted). Moreover, Lynxnet also struggled to determine the appropriate method for calculating STOPSO's labor costs. Int. 9/5/14 Mem. at 3–4 nn. 1–2.

As to the allegations that the FBI's contracting officer should have discussed these purported mistakes with Plaintiff, the Government describes this argument as "succumb[ing] to the logical fallacy that an absence of evidence amounts to evidence of absence" and "ignores the more obvious reality—the Government elected not to redundantly acknowledge a point that was clear on the face of STOPSO's proposal." Gov't 9/15/14 Reply at 2 n.1; Int. 9/15/14 Reply at 15 ("The reason the FBI did not raise what [Plaintiff] terms 'the 1099 issue' in discussions is quite simple, though: STOPSO's proposal did not actually propose or price a 1099, but rather, clearly proposed its [I]ndustrial [H]ygienist position as a STOPSO employee."). Therefore, Plaintiff "failed to carry its burden" in challenging the contract award to STOPSO. Gov't 9/5/14 Mem. at 2; Int. 9/15/14 Reply at 10.

### 3. The Court's Resolution.

Plaintiff is correct that 13 C.F.R. § 125.1(g) does not allow a contractor to include indirect costs, such as the **REDACTED** fee included in STOPSO's proposal. AR Tab 13 at 2494 (**REDACTED** fee line). For that reason, the FBI contracting officer recalculated STOPSO's "Proposal Cost/Price Fee: Total Price Summary" to exclude the **REDACTED** fee. AR Tab 46a, at 3476. In doing so, the contracting officer confirmed that STOPSO's proposal was compliant and still well below Plaintiff's proposed price. Although the contracting officer could have brought this issue to the attention of STOPSO for correction, under these circumstances, the court does not consider the contracting officer's decision to make the correction a material error. *See Axiom Res. Mgmt.*, 564 F.3d at 1381 (holding that an error by the procuring agency must be "clear and prejudicial" to overturn an award decision).

To establish a lack of a rational basis, a plaintiff must show that the agency failed to reduce to writing a "rational reasoning and consideration of relevant factors." *Savantage Fin. Servs.*, 595 F.3d at 1287. In this case, the Administrative Record evidences that the FBI's decision that **REDACTED** was a STOPSO employee and not an independent contractor was carefully considered, as reflected in evaluation documents. AR Tab 1a, at 98, 99; AR Tab 4a, at 1083; AR Tab 4b, at 1179, 1287; AR Tab 13, at 2528–30. Therefore, the court cannot find in good faith that the FBI did not have a "rational basis" in awarding the contract to STOPSO. *See Bannum*, 404 F.3d at 1355, 1357 (requiring the United States Court of Federal Claims to "weigh[] the evidence" of procurement errors "as if it were conducting a trial on the record"); *see also Weeks Marine*, 575 F.3d at 1368–69 ("[P]rocurement decisions invoke[] highly deferential rational basis review . . . . Under that standard, we sustain an agency action evincing rational

reasoning and consideration of relevant factors.") (internal quotations and citations omitted); *Centech Group, Inc. v. United States*, 554 F.3d 1029, 1037 (Fed. Cir. 2009) (requiring the court to "determine whether the contracting agency provided a coherent and reasonable explanation of its exercise of discretion, and the disappointed bidder bears a heavy burden of showing that the award decision had no rational basis") (internal citations and quotations omitted).

To overturn an award decision as arbitrary or capricious, the court must determine that the agency "entirely failed to consider an important aspect of the problem, offered an explanation for its decision that runs counter to the evidence before the agency, or [the decision] is so implausible that it could not be ascribed to a difference in view or the product of agency expertise." *State Farm Mut. Auto. Ins. Co.*, 463 U.S. at 43; *see also John C. Grimberg Co.*, 702 F.2d at 1372 (holding that the court may set aside agency action "only in extremely limited circumstances").

Finally, Plaintiff's allegations that the contracting officer did not consider nor discuss STOPSO's purported mistakes is not dispositive. The court cannot assume that the contracting officer did not consider STOPSO's compliance with the LOS Requirement, based on the absence of an explicit reference in the Administrative Record of that fact. Plaintiff's request that the court establish a rule whereby agencies affirmatively must document compliance with each and every proposal requirement is not the law. *See John C. Grimberg Co.*, 702 F.2d at 1372 ("[The United States Court of Federal Claims'] equitable powers should be exercised in a way which best limits judicial interference in contract procurement and administration."); *see also Ala. Aircraft Indus. Inc.-Birmingham*, 586 F.3d at 1375 (holding that the court must find that "the agency entirely failed to consider an important aspect of the problem, offered an explanation for its decision that runs counter to the evidence before the agency, or [the decision] is so implausible that it could not be ascribed to a difference in view or the product of agency expertise") (internal quotation marks and citations omitted). The court has been authorized by Congress to adjudicate cases only when the contracting officer's decision lacked a rational basis or was arbitrary or capricious, which Plaintiff has not established.

For these reasons, the court has determined that the FBI's decision to award the contract to STOPSO was not "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law[.]" 5 U.S.C. § 706(2)(A); *see also* 28 U.S.C. § 1491(b)(4). Assuming, *arguendo*, there is a violation, Plaintiff failed to establish that the FBI's best value procurement decision was not "grounded in reason." *Unisys Corp.*, 98 F.3d at 1327; *see also Galen Med. Assocs., Inc.*, 369 F.3d at 1330 (holding that a contracting officer has great discretion in best value procurement decisions).

## IV. CONCLUSION.

For reasons discussed herein, Plaintiff's August 29, 2014 Motion For Judgment On The Administrative Record is denied. The Government's and Intervenor's September 5, 2014 Cross-Motions are granted. Accordingly, the Clerk is direct to enter judgment on behalf of the Government and Intervenor.

No costs.

**IT IS SO ORDERED.**

s/ Susan G. Braden<br>
**SUSAN G. BRADEN**<br>
**Judge**